## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

PPJ, LLC,

      *Plaintiff*,

v.

      C.A. No. 1:24-cv-12868

Ruoey Lung Enterprise Corp.,
Star Seeds Co., Ltd., and
Indigo Furniture Limited,

      *Defendants*.

## COMPLAINT

NOW COMES Plaintiff, PPJ, LLC ("PPJ"), by and through its attorneys, and for its Complaint against Defendants Ruoey Lung Enterprise Corp., Star Seeds Co., Ltd., and Indigo Furniture Limited, (the "Defendants"), alleges as follows:

## INTRODUCTION

This is a civil action for breach of contract, breach of the implied warranty of merchantability, breach of the implied warranty of fitness for a particular purpose, and unjust enrichment arising from the Defendants' sale to PPJ of adjustable bed frames containing defective control boxes. As a result of Defendants' actions and omissions, PPJ has incurred substantial damages, including the costs of replacing the defective products, harm to its business reputation, and loss of profits.

## THE PARTIES

1. PPJ is a limited liability company duly organized and existing under the laws of the Commonwealth of Massachusetts, with its principal place of business located at 2 Carsha Drive, Natick, Middlesex County, Massachusetts.

2.   Upon information and belief, Defendant Ruoey Lung Enterprise Corp. ("RLEC") is a Taiwanese company, Unified Business Number 89565120, with a principal place of business at No. 17, Lugong S. 2nd Rd., Lukang Township, Changhua County 505029, Taiwan (R.O.C.).

3.   Upon information and belief, Defendant Star Seeds Co., Ltd. ("Star Seeds") is a Taiwanese company, Unified Business Number 70673367, with a principal place of business at No. 7, Datong Rd., Caonan Vil., Wuqi Dist., Taichung City 435059, Taiwan (R.O.C.).

4.   Upon information and belief, Defendant Indigo Furniture Limited ("Indigo") is a Hong Kong company, CR Number 2389463, with a principal place of business at FLAT/RM A, 12/F, ZJ 300, 300 Lockhart Road, Wan Chai, Hong Kong.

## JURISDICTION AND VENUE

5.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties are citizens of different states. PPJ is a citizen of Massachusetts, and Defendants are citizens of Taiwan and Hong Kong. Accordingly, complete diversity of citizenship exists between the parties, satisfying the requirements of § 1332. Federal diversity jurisdiction is proper under 28 U.S.C. § 1332(a)(2) because PPJ is a citizen of Massachusetts, and the Defendants are foreign citizens, with RLEC and Star Seeds based in Taiwan and Indigo based in Hong Kong, thereby establishing complete diversity between the parties.

6.   This Court has personal jurisdiction over Defendants RLEC, Star Seeds, and Indigo because each has substantial contacts with Massachusetts, including contacts that are directly related to the claims in this lawsuit, such as:

   a.   Defendant RLEC entered an Exclusive Sales Representation Agreement ("ESRA") with PPJ dated August 10, 2010, in which RLEC, as a company that would

"manufacture . . . adjustable bedframes, adjustable bed bases and adjustable mattresses or similar products" contracted with PPJ such that PPJ agreed to, inter alia, "use its reasonable efforts to *(i)* make sales of, among other things, those products of Companies, including those referred to herein above as Products; and *(ii)* make introductions to, or otherwise initiate sales relationships with, potential customers of the Companies in the territories of the United States of America, Canada and South America".

b.  RLEC's ESRA with PPJ included a Choice of Law and Forum Clause in which RLEC agreed that the ESRA "shall be construed under, the laws of the Commonwealth of Massachusetts, without regard to the principle of conflicts of laws. In addition, the parties agree that the courts located in Boston, Massachusetts shall have exclusive jurisdiction in any action or proceedings with respect to this Agreement, including the federal district courts located therein."

c.  Each Defendant entered into a Settlement Agreement with PPJ dated July 16, 2021 (the "Settlement Agreement"), which explicitly designated Massachusetts as the governing law and named Boston federal district courts as the forum for disputes.

d.  The Defendants each conducted business directly with PPJ, a company with its principal address in Natick, Massachusetts, including, upon information and belief, by accepting purchase orders (RLEC); preparing shipping orders and shipping goods to Massachusetts, including the goods in question (RLEC, Star Seeds); and/or issuing invoices and accepting payment for the goods in question (Star Seeds, Indigo).

    e.   RLEC and Star Seeds shipped products to PPJ's customers located in Massachusetts, including delivery addresses in East Taunton (Bristol County) and Avon (Norfolk County).

    f.   RLEC and Star Seeds responded to PPJ's purchase orders by delivering adjustable bed frames with integrated control boxes to Massachusetts-based customers, reflecting their purposeful availment of the Massachusetts market.

    g.   RLEC designated Indigo to receive payments made by PPJ pursuant to the purchase orders for goods that were delivered to customers located in Massachusetts and, upon information and belief, is merely an alter ego of RLEC and/or Star Seeds.

    h.   Executives of RLEC and, upon information and belief, Star Seeds have traveled to Massachusetts and met with PPJ's representatives, further supporting personal jurisdiction.

7.   By conducting business in Massachusetts and agreeing to resolve disputes in Boston federal district courts, Defendants have each purposefully availed themselves of the privileges and benefits of conducting business in this forum, and the claims in this case arise directly out of Defendants' activities in Massachusetts.

8.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Massachusetts, including Defendants' shipments of defective products to PPJ's customers in Massachusetts. Furthermore, the Settlement Agreement between PPJ and Defendants specifies Massachusetts law as governing and designates federal district courts in Boston as the appropriate forum for disputes.

## STANDING AND CAPACITY

9.  Plaintiff PPJ has standing to bring this action as it is the party directly harmed by Defendants' breaches and defective products. PPJ has the legal capacity to sue in Massachusetts, and the Defendants, as foreign entities who conducted business in the Commonwealth, have the capacity to be sued under both federal and Massachusetts law.

## FACTUAL BACKGROUND

### A.  PPJ and RLEC Enter Into an Exclusive Sales Representation Agreement

10. Defendant RLEC entered into the ESRA with PPJ dated August 10, 2010, in which RLEC, as a company that would "manufacture . . . adjustable bedframes, adjustable bed bases and adjustable mattresses or similar products" contracted with PPJ, such that PPJ agreed to, inter alia, "use its reasonable efforts to (i) make sales of, among other things, those products of Companies, including those referred to herein above as Products; and (ii) make introductions to, or otherwise initiate sales relationships with, potential customers of the Companies in the territories of the United States of America, Canada and South America."

11. Pursuant to the ESRA and the parties' established course of dealing, PPJ would receive a purchase order from a customer. PPJ would convert this into its own purchase order, reflecting the prices negotiated by PPJ and RLEC, and then send the purchase order to RLEC. In turn, Star Seeds would issue a pro forma invoice to PPJ indicating, for example, any shipping or quantity modifications and the departure date. PPJ would advise the customer of any such changes, amend the purchase order accordingly and transmit the same to RLEC. Following this, upon estimated departure date from port, Star Seeds would issue a commercial invoice requesting payment. PPJ would typically submit payment within one week of receiving payment from the customer.

12. While this process remained constant throughout the parties' course of dealing and always began with PPJ sending a purchase order to RLEC, the various Defendants assumed different roles over time. Starting in or around 2018 or 2019, for example, PPJ began to receive the pro forma invoices from Star Seeds rather than RLEC. This despite PPJ issuing its original purchase orders, reflecting the purchase orders received from its customers, to RLEC.

13. Originally, PPJ would submit payment to RLEC to satisfy the purchase orders issued to RLEC (and then handled by Star Seeds). However, since at least 2017, per RLEC's instruction PPJ has made all invoice payments to Indigo rather than RLEC or Star Seeds.

14. All payments PPJ made to Indigo per the instruction of RLEC were also recognized by RLEC and Star Seeds.

**B.  PPJ and Defendants Enter Into the Settlement Agreement and the Defendants Supply Units of Adjustable Bed Frames With Defective Control Boxes**

15. On or about July 16, 2021, PPJ and Defendants entered into the Settlement Agreement related to previous disputes, wherein Defendants and PPJ agreed to mutual releases, but also agreed that the releases would not apply to "the respective rights and obligations of [RLEC] and PPJ under orders by PPJ for products placed prior to the Effective Date, including without limitation, the right of PPJ to require delivery of conforming goods by RLE . . . ."

16. Defendants agreed to supply adjustable bed frames to PPJ that met certain identified specifications and purchase orders issued by PPJ. As part of this arrangement, Defendants were responsible for selecting components to be included in the adjustable bed frames, such as a control box.

17. Defendants are regularly engaged in the business of manufacturing and selling adjustable bed frames with an integrated control box to operate the bed frame, and the adjustable bed frames supplied to PPJ were sold in the ordinary course of Defendants' business.

18. Defendants supplied PPJ with at least 22,508 units of adjustable bed frames with integrated control boxes, which were resold to PPJ's reseller.

19. PPJ ordered each of those at least 22,508 adjustable bed frame units using one or more written purchase orders, which Defendants accepted and for which the Defendants issued corresponding pro forma invoices and related shipping and delivery documentation.

20. Purchase orders for the adjustable bed frame units, with the integrated control boxes, were placed and satisfied from 2019 through 2022.

21. For all purchase orders for the adjustable bed frame units, PPJ and Defendants maintained their standard course of dealing with respect to the ordering, shipping, and payment for Defendants' products. PPJ would send a purchase order to RLEC, Star Seeds would return an altered pro forma invoice if necessary, and PPJ would transmit payment to Indigo.

22. Defendants have acknowledged the defects in the adjustable bed frame units and their responsibility to cure the defects, and have reimbursed PPJ for the repair of some of the defective units, but have failed to remedy most of the defective units.

23. Of the at least 22,508 defective adjustable bed frame units, 1,966 have been fixed, but at least 20,542 have not been fixed.

24. One essential, implicit requirement for the control boxes integrated in the adjustable bed frames supplied by the Defendants to be considered merchantable is that they must not short out under normal conditions of use, as shorting out would render the control box incapable of performing its basic function, which would fail to meet even minimal standards of reliability and safety expected by any consumer or end user.

25. PPJ informed Defendants that the adjustable bed frames, and therefore the integrated control boxes, were intended for distribution to PPJ's customers.

26. Defendants were aware of the particular purpose for which adjustable bed frames were being purchased and acknowledged that its products would be suitable for that purpose.

27. The control boxes in the adjustable bed frames delivered by Defendants to PPJ did not meet the agreed-upon specifications, as the control boxes contained defective MOSFETs,[1] rendering the control boxes susceptible to failure due to static electricity during normal consumer use.

28. As a result of these defects, numerous units of the adjustable bed frames supplied by Defendants to PPJ have failed and PPJ's customer has required PPJ to replace the at least 1,966 adjustable control box units at its own expense. At a minimum, an additional 20,542 defective units remain in circulation and are certain to fail.

29. PPJ has had to procure replacement, functioning control boxes from a different supplier to fulfill its obligations to its reseller and end users.

30. PPJ has notified Defendants of the defects.

31. Defendants have acknowledged that the control boxes have failed and have agreed to explore methods to remedy that failure. However, despite having had ample opportunity to do so, they have failed to provide adequate replacements or reimbursement for all but a small portion of the defective units, leaving PPJ to bear the costs of remedying the defects.

32. PPJ has suffered significant financial harm as a result of Defendants' breaches, including but not limited to the cost of replacing the remaining defective control boxes, loss of profits, harm to PPJ's business reputation, and damage to PPJ's relationship with its reseller(s).

---

[1] A MOSFET, an acronym, is a metal-oxide semiconductor field-effect transistor—an electronic component used in various circuits to control power. It is also used in adjustable beds to control electronic bed adjustment.

<u>COUNT I</u>
**(BREACH OF CONTRACT – All Defendants)**

33. PPJ incorporates by reference all preceding paragraphs as though fully set forth herein.

34. Defendant RLEC entered into the ESRA with PPJ dated August 10, 2010, in which RLEC, contracted with PPJ, such that PPJ agreed to, *inter alia*, use its reasonable efforts to sell bed frames manufactured and supplied by RLEC.

35. Pursuant to the ESRA and the parties' established course of dealing, PPJ would receive a purchase order from a customer and then convert this into its own purchase order, which PPJ would send to RLEC. RLEC or, later, Star Seeds, would send a pro forma invoice back to PPJ reflecting any modifications to the order and the departure date. PPJ would advise the customer of these changes, amend the purchase order accordingly and transmit the same to RLEC. Following this, upon estimated departure date from port, Star Seeds would issue a commercial invoice requesting payment. PPJ would typically submit payment within one week of receiving payment from the customer.

36. PPJ originally would transmit payment to RLEC. Since at least 2017, PPJ made all invoice payments to Indigo per RLEC's instructions, and RLEC and Star Seeds have recognized the payments made to Indigo.

37. The parties continued their business relationship, regularly ordering, shipping, invoicing, and paying for goods in accordance with the same established course of dealing described herein after termination of the ESRA prior to July 16, 2021.

38. On or about July 16, 2021, PPJ and Defendants entered into the Settlement Agreement agreeing to mutual releases but also agreeing that the releases would not apply to orders by PPJ for products placed prior to the settlement agreement's effective date, including without limitation, the right of PPJ to require delivery of conforming goods by RLEC.

39. Defendants supplied PPJ with at least 22,508 units of adjustable bed frames with integrated control boxes, which were resold to PPJ's reseller.

40. PPJ ordered each of those at least 22,508 adjustable bed frames using one or more written purchase orders, which Defendants accepted and for which the Defendants issued corresponding pro forma invoices, invoices, and related shipping and delivery documentation.

41. Purchase orders for the adjustable bed frame units, with the incorporated control boxes, were placed and satisfied from 2019 through 2022.

42. For all purchase orders for the adjustable bed frames, PPJ and Defendants continued their standard course of dealing with respect to the ordering, shipping, and payment for Defendants' products. PPJ would send a purchase order to RLEC, Star Seeds would return an altered pro forma invoice if necessary, and PPJ would transmit payment to Indigo.

43. Defendants breached the parties' contract and course of dealing by delivering adjustable bed frames with defective control boxes that failed to meet the identified specifications, as the control boxes would short out when exposed to ordinary static electricity, rendering the adjustable bed frames unusable for their intended purpose.

44. As a direct and proximate result of Defendants' breach, PPJ has suffered damages in excess of $3,117,550, including the cost of replacing defective units, consequential damages, and lost profits.

### COUNT II
### (BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY –
### All Defendants)

45. PPJ incorporates by reference all preceding paragraphs as though fully set forth herein.

46. The control boxes are an integrated and essential component of the adjustable bed frames, and their failure renders the entire product unmerchantable and unfit for ordinary use.  Defendants,

as entities regularly engaged in the business of manufacturing and selling adjustable bed frames with integrated control boxes, impliedly warranted that the control boxes provided as an integrated and essential component were merchantable and fit for their ordinary purpose.

47. Defendants, as the supplier of adjustable bed frames with integrated control boxes, impliedly warranted that the adjustable bed frames with integrated control boxes were merchantable and fit for their ordinary purpose under Mass. Gen. Laws ch. 106, § 2-314.

48. The adjustable bed frames with integrated control boxes provided by Defendants were defective, unmerchantable, and unfit for ordinary use because they failed during normal consumer use.

49. As a direct and proximate result of Defendants' breach of the implied warranty of merchantability, PPJ has suffered damages in excess of $3,117,550, including the cost of replacing defective units and related consequential damages.

## COUNT III
**(BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE – All Defendants)**

50. PPJ incorporates by reference all preceding paragraphs as though fully set forth herein.

51. PPJ informed Defendants that the adjustable bed frames, and therefore the integrated control boxes, were being purchased for normal consumer use and therefore had to be able to withstand normal consumer use.

52. Normal consumer use includes not shorting out due to exposure to ordinary static electricity.

53. PPJ relied on Defendants' expertise and judgment in selecting suitable control boxes to be integrated into the adjustable bed frames for this particular purpose, and Defendants were aware of this reliance.

54. The adjustable bed frames with integrated control boxes provided by Defendants were not fit for the particular purpose for which they were intended, as they failed during normal consumer use.

55. As a direct and proximate result of Defendants' breach of the implied warranty of fitness for a particular purpose under Mass. Gen. Laws ch. 106, § 2-315, PPJ has suffered damages in excess of $3,117,550, including the cost of replacing defective units and related consequential damages.

## COUNT IV
### (UNJUST ENRICHMENT – All Defendants)

56. PPJ incorporates by reference all preceding paragraphs as though fully set forth herein.

57. Defendants have been unjustly enriched by receiving payment from PPJ for adjustable bed frames with defective control boxes that failed to meet the agreed-upon specifications and were not fit for use in PPJ's products.

58. PPJ conferred a benefit on Defendants by paying for the adjustable bed frames with control boxes, and Defendants' retention of these payments, without providing non-defective goods or adequate reimbursement, is unjust.

59. As a result of Defendants' unjust enrichment, PPJ seeks restitution in an amount to be determined at trial, but not less than $3,117,550, plus consequential and incidental damages.

## PRESERVATION OF EVIDENCE

60. PPJ requests that Defendants preserve all relevant evidence, including but not limited to, electronic communications, emails, internal documents, quality control records, and testing data related to the manufacture and supply of the control boxes at issue, to prevent spoliation and ensure a fair adjudication of the claims. PPJ further requests that Defendants instruct all relevant employees and agents to retain and preserve all documents, communications, and electronic data

related to the manufacture, quality control, and testing of the control boxes, to prevent inadvertent or intentional spoliation.

## REQUESTS FOR RELIEF

WHEREFORE, PPJ, LLC respectfully requests that the Court enter judgment in its favor as follows:

A.  An award of damages in an amount not less than $3,117,550, including all consequential and incidental damages;

B.  Restitution for unjust enrichment in an amount to be determined at trial;

C.  Award PPJ, LLC its costs, reasonable attorneys' fees, and interest as permitted by law; and

D.  Award such other relief as the Court deems just and proper.

## REQUEST FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: November 18, 2024                    Respectfully submitted,


By:  */s/Lawrence K. DeMeo*_____
          Lawrence K. DeMeo (BBO# 658867)
          **HUNTON ANDREWS KURTH LLP**
          60 State Street, Suite 2400
          Boston, MA 02109
          (617) 670-8800/(617) 670-8801 (fax)
          ldemeo@huntonak.com

          *Attorney for Plaintiff PPJ, LLC*